UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| STEVEN EVANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:06-CV-00165 |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

On April 20, 2006, Plaintiff Steven Evans appealed to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying Evans's application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.)  After Evans filed his opening brief, the Commissioner filed a Motion for Remand (Docket # 19), acknowledging that a remand for further proceedings in this case is appropriate so that the ALJ may properly consider the medical source opinions and Evans's credibility, specifically determine Evans's literacy and residual functional capacity, and obtain evidence from a vocational expert and a medical expert.

Evans, however, disagrees with the scope of the Commissioner's proffered remand.  He contends that any remand should direct the payment of DIB as of his fiftieth birthday[2] and should mandate the administration of a psychological evaluation that includes standardized literacy and

---

[1] All parties have consented to the Magistrate Judge. (Docket # 14); *see* 28 U.S.C. § 636(c).

[2] Evans turned fifty years old on January 24, 2005, approximately four months before the ALJ issued his decision. (Tr. 30A, 87.)

intelligence testing. (*See* Def.'s Reply to Pl.'s Objections to Mot. to Remand at 1.)

For the reasons set forth herein, Evans's arguments are ultimately unpersuasive. Therefore, as requested by the Commissioner, the Commissioner's decision will be REVERSED and the case will be REMANDED to the Commissioner for further administrative proceedings.

## I.  PROCEDURAL HISTORY

Evans applied for DIB on February 11, 2002, alleging that he became disabled as of August 15, 2001. (Tr. 87-89.)  The Commissioner denied his application initially and upon reconsideration, and Evans requested an administrative hearing. (Tr. 47-48, 54-57.)  On October 14, 2004, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Evans, who was represented by counsel, his wife, and a vocational expert testified. (Tr. 412-32.) On May 10, 2005, the ALJ rendered an unfavorable decision to Evans, concluding that he was not disabled because he could perform a significant number of jobs in the national economy despite the limitations caused by his impairments. (Tr. 21-30A.)  The Appeals Council denied Evans's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 7-12.)

Accordingly, Evans filed a complaint with this Court on April 20, 2006, seeking relief from the Commissioner's final decision. (Docket # 1.)  On August 21, 2006, Evans filed his opening brief in support of his appeal; in response, the Commissioner filed the instant motion to remand. (Docket # 13, 19.)

## II.  FACTUAL BACKGROUND[3]

*1. Background and Daily Activities*

At the time of the ALJ's decision, Evans was fifty years old, had a sixth grade education, and possessed work experience as an assembler, machine operator feeder, conveyor ladder, foundry laborer, and assembler/machine operator. (Tr. 21, 87, 101, 128.)  Evans alleged in his DIB application that he became disabled as of August 15, 2001, due to degenerative disk disease of the low back. (Tr. 95.)

At the hearing, Evans testified that he lives in a house with his wife, who works the day shift. (Tr. 419, 425.)  He explained that he spends his days performing light household work, including cooking, washing dishes, picking up the house, and doing laundry; mowing the lawn with a riding mower; "wander[ing]" in his barn; driving a car; and visiting with friends and family. (Tr. 420-21.)  Evans's wife, however, emphasized that Evans takes frequent breaks when performing his daily routine due to his pain, stating that he is "never up long." (Tr. 426.)  She explained that after Evans performs a task, he will often sit or lie down on a heating pad for an hour before attempting the next task. (Tr. 426.)

When asked to describe his physical problems, Evans stated that he has "a great deal of pain," which intensifies with any movement. (Tr. 415.)  He explained that the pain shoots into his legs and down into his ankles and that he has "constant pain" in his lower back. (Tr. 415.)  For pain control, Evans reported that he takes OxyContin, which "dulls the pain" but does not take it away. (Tr. 416.)  He also explained that he has tried physical therapy, a TENS unit, and a

---

[3] The administrative record in this case is voluminous (432 pages), and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

heating pad to help relieve his pain. (Tr. 423.)

In addition, Evans testified at the hearing about his ability to read and write:

Q      You have a sixth grade education?
A      Yes.

Q      Can you read and write?
A      No.

. . . .

Q      The fact that you couldn't read and write, did that affect you any at all [on the job], or did the other people help you out?
A      I had a group leader that oversaw everything we did.  If we made mistakes, he would come back and correct us.

. . . .

Q      Now regarding your ability to read and write . . . . [Y]ou can't read a newspaper?
A      I cannot read newspapers, sir.  No.

Q      Did you have a driver's license?
A      Yes, sir.

Q      Did you take the test?
A      Yes, sir.

Q      How did you do that?
A      [I]t took me three times to pass those tests.  I'm not ignorant and I'm not stupid.

Q      Yes.  I understand.
A      And I recognize words.

(Tr. 416-17, 420.)

### 2. Relevant Medical History

On August 10, 2001, Evans injured his back at work, though he continued to work the remainder of that day and for the next three days. (Tr. 422.)  Eventually, however, his pain intensified, causing his company nurse to refer him to an orthopaedist. (Tr. 95, 422.)

On August 15, 2001, Evans visited Dr. Scott Trumble, an orthopaedist at Orthopedic & Sports Medicine Center of Northern Indiana, Inc., complaining of low back and right leg pain caused by the work-related injury. (Tr. 172.)  An x-ray showed no abnormalities; Dr. Trumble suspected a herniated disk and recommended that Evans undergo a nerve block. (Tr. 172.)

Two days later, Evans returned to Dr. Trumble, who noted that the nerve block provided Evans with some mild relief though he still had pain and some weakness in his right leg. (Tr. 166.)  As a result, Dr. Trumble ordered a lumbar MRI and another epidural block, restricting Evans to perform only a "seated job." (Tr. 166.)  Several days later, the results of the MRI evidenced that Evans had degenerative disk disease at the L1-2 disk space but no herniated disk. (Tr. 165.)  Dr. Trumble recommended that Evans take Motrin and begin physical therapy, altering his work restrictions as follows: no lifting in excess of ten pounds, no prolonged static positions, no bending below the knee height, no awkward positions, and no twisting or stretching. (Tr. 163.)

Evans visited Dr. Trumble again in September and October 2001, reporting that he was still suffering from pain but that he was approximately fifty percent better since his injury. (Tr. 152, 156.)  Dr. Trumble noted that Evans rose rather slowly from sit to stand, had decreased lumbar range of motion, walked with a very rigid gait, and that a straight leg raise test caused him pain. (Tr. 152, 156.)  Dr. Trumble concluded that Evans was "very slow to improve," recommending that he continue physical therapy and the nerve blocks. (Tr. 152.)  He also continued the previously-assigned work restrictions, which he anticipated changing at Evans's next visit. (Tr. 152.)

However, on October 30, 2001, Evans's orthopaedic care was moved from Dr. Trumble

5

to Dr. Robert Shugart, an orthopaedic surgeon at Fort Wayne Orthopaedics. (Tr. 241.)  Dr. Shugart referred Evans for a discography, which showed multilevel discogenic pain with L5-S1 and L1-2 as the most significant cause of his pain. (Tr. 228.)  Dr. Shugart explained to Evans that he was not a candidate for fusion and instead recommended that he undergo intradiscal electrothermal therapy (IDET), cautioning that the chances of it relieving his pain were perhaps as low as fifty percent. (Tr. 228.)  Evans underwent the IDET procedure one week later. (Tr. 219-21.)

On November 29, 2001, Evans returned to Dr. Shugart, who noted that Evans was still experiencing back and leg pain without much improvement. (Tr. 214.)  Dr. Shugart renewed Evans's Flexeril and Vicodin, continued him off work, and referred him to a physiatrist for pain management. (Tr. 214.)

One week later, Evans visited Dr. Thomas Lazoff, a specialist in physical medicine and rehabilitation, reporting that his pain was a "five" on a "good day" and a "ten" on a "bad day."[4] (Tr. 206-09.)  While Dr. Lazoff noted during his clinical examination that Evans had muscle weakness in the "3/5" range and limited range of motion, he also observed that Evans demonstrated significant pain behaviors, over-exaggeration in Waddell testing, discrepancy in sitting and supine straight leg raising, and impaired sensation in the left lower extremity in a non-dermatomal pattern. (Tr. 207-08.)  Dr. Lazoff surmised that Evans was taking too many Vicodin (eleven) per day and consequently replaced it with a Duragesic patch, ultimately opining that he was "skeptical of complete resolution of symptoms based on [Evans's] presentation today

---

[4] Evans's pain levels are presumed to be reported on a scale of one to ten, with "one" being no pain and "ten" being pain that would cause him to go to an emergency room.

6

as well as his history of being off work for 11 months just due to a hamstring injury." (Tr. 208-09.)      On December 19, 2001, Evans returned to Dr. Lazoff, reporting that he was doing better overall. (Tr. 197.) Dr. Lazoff continued his medication and assigned the following work restrictions: no prolonged walking; no standing over one-half hour; alternate sitting and standing as tolerated; no bus, truck, or forklift driving; no squatting, kneeling, bending, twisting, stretching, or climbing ladders; only occasional climbing of stairs; no lifting over five to ten pounds; no repetitive use of the right leg; and limit work to the waist level only. (Tr. 198.)

One month later Evans again visited Dr. Lazoff, reporting that he was having numbness in his legs. (Tr. 190-92.) Dr. Lazoff ordered an EMG, the results of which were essentially normal. (Tr. 179-82, 190-92.) During the examination, Dr. Lazoff noted that Evans demonstrated significant pain behaviors, such as moving very slowly and breathing very heavy. (Tr. 180.) Dr. Lazoff concluded that conservative treatment measures had not benefitted Evans and that a functional capacity evaluation (FCE) would ultimately be futile because he doubted whether Evans could tolerate any activity during the FCE. (Tr. 180.) Dr. Lazoff opted then to continue Evans's work restrictions and recommended that he follow up with Dr. Shugart for a final opinion. (Tr. 180.)

On February 19, 2002, Evans returned to Dr. Shugart, who concluded that "[w]e have pretty much exhausted all of the options." (Tr. 176.) He then opined that Evans was at maximum medical improvement, assigning him a permanent partial impairment rating of eight percent and "a permanent sedentary restriction" as follows: no lifting more than five pounds; no repetitive bending or twisting, no unpredicted heights, and no heavy driving; and must include a sit-to-stand option. (Tr. 176.) However, Dr. Shugart further stated: "The good news is that

7

[Evans's] EMG was negative for radiculopathy, and I think with time he will show improvement." (Tr. 176.)

After his release from Dr. Shugart and Dr. Lazoff, Evans turned to Dr. Gerald Warrener, a general practitioner, for medical assistance with his back problems. (Tr. 299.) Upon clinical examination at his first visit, Dr. Warrener noted Evans's stiffness and poor motion in his back, as well as tenderness over his lower spine. (Tr. 299.) Dr. Warrener prescribed various pain medications, stating that "[h]opefully with this we can avoid habituation, and [Evans] will slowly improve." (Tr. 299.) Not long thereafter, Evans requested that Dr. Warrener refer him to a pain management specialist. (Tr. 298.)

On July 9, 2002, Evans visited Dr. Stephen Hatch, a pain management specialist, describing his pain as "sharp, burning, numbing between 5/10 and 10/10 in intensity." (Tr. 296-97.) On physical examination, Dr. Hatch noted that Evans had a wide-based gait, some lower extremity atrophy, diminished reflexes in L4, and pain upon straight leg raising. (Tr. 297.) Since Evans had failed most other treatments, Dr. Hatch recommended that Evans undergo the Minnesota Multiphasic Personality Inventory (MMPI) and a trial of spinal cord stimulation. (Tr. 296-97.)

However, on September 23, 2002, Evans returned to Dr. Warrener for his back pain, reporting that he did not find Dr. Hatch very helpful and that his insurance would not cover the recommended spinal cord stimulation. (Tr. 319.) Evans told Dr. Warrener that taking OxyContin was his only effective method of pain relief; consequently, Dr. Warrener prescribed OxyContin, stating that "we will certainly need to watch his use of this." (Tr. 319.)

On October 17, 2002, Evans visited Dr. Michael Holton for an orthopaedic examination

8

at the request of the Social Security Administration. (Tr. 303-05.)  Dr. Holton noted that Evans appeared markedly uncomfortable and had limited range of motion, that he had marked tenderness and spasm of the lumbar paravertebrals, that his muscle strength was diminished in both lower extremities in the "3/5" range, and that his gait was antalgic favoring the right lower extremity with marked slowing. (Tr. 303-05.)  He assessed that Evans was too unstable with ambulation to safely attempt the requested ambulatory maneuvers. (Tr. 303-05.)  He assigned Evans a diagnosis of chronic radicular low back pain, noting that Evans "gave good effort to the examination proceedings." (Tr. 303-05.)

On October 27, 2002, Dr. R. Fife, a state agency physician, reviewed Evans's medical record and completed a physical residual functional capacity assessment. (Tr. 306-13.)  She concluded that Evans could occasionally lift and/or carry ten pounds; frequently lift and/or carry less than ten pounds; stand and/or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; perform unlimited pushing and/or pulling; occasionally climb ramps and stairs, balance, stoop, kneel, and crawl; never crouch or climb ladders, ropes, or scaffolds; and must avoid even moderate exposure to machinery and heights. (Tr. 311.)  Dr. Fife also opined that her conclusions concerning Evans's limitations were not significantly different from the other medical source opinions of record. (Tr. 312.)  Dr. Fife's opinion was later affirmed by a second state agency physician. (Tr. 313.)

From February 2003 through October 2004, Evans continued to visit Dr. Warrener, who regularly renewed Evans's OxyContin prescription. (Tr. 317.)  In February 2003, Dr. Warrener checked the "total disability" box on a disability form for Evans and opined: "I don't believe [Evans] will ever be able to return to his former work.  He will always be severely limited in

9

lifting, bending, etc." (Tr. 316.)  In June 2004, Dr. Warrener noted that Evans continued to complain of severe limitations due to his constant back pain and that he had severely limited range of motion and diffuse tenderness along his spine. (Tr. 393.)  He also commented that Evans was a "bitter man," attributing this to the fact that Evans had not worked for the past three years as a result of his back condition. (Tr. 393.)  On August 23, 2004, Evans underwent another MRI, which showed evidence of an annular tear and progressive degenerative disk disease with disk protrusion at L4-5. (Tr. 344.)

      On October 20, 2004, Evans returned to Orthopaedic and Sports Medicine Center of Northern Indiana, Inc., this time visiting Dr. Michael Hartman, an orthopaedist. (Tr. 330-34.)  Evans reported to Dr. Hartman that his pain had been "staying the same," ranging between a "five" and a "ten." (Tr. 330.)  Upon clinical examination, Dr. Hartman noted that Evans's lower extremity strength was normal at "5/5,"[5] that he had pain and minimal tenderness with all ranges of motion, and that he walked with an exaggerated gait. (Tr. 330-34.)  Dr. Hartman stated that though Evans's x-rays showed disk height loss at L1-2 and L4-5, he could not explain all of Evans's symptoms, opining that "his symptoms seem to be worse than his objective findings." (Tr. 330-34.)  Dr. Hartman ordered Evans to undergo a discogram to determine whether the annular tear at L4-5 was "the cause of his problems," explaining that if the results were inconclusive he would recommend that Evans undergo bilateral medial branch blocks and, if successful, consideration for radiofrequency rhizotomy.  Dr. Hartman further explained that if the discogram results were conclusive, "then [Evans] needs surgery."

---

[5] Dr. Hartman commented that it took "considerable effort" to get Evans to exert full effort in muscle testing. (Tr. 333.)

10

*3. The ALJ's Decision*

On May 10, 2005, the ALJ rendered his opinion. (Tr. 21-30A.)  He found at step one of the five-step analysis that Evans had not engaged in substantial gainful activity since his alleged onset date, and at step two that he had a "severe" back impairment. (Tr. 30.)  However, at step three, he determined that Evans's back impairment was not severe enough to meet a listing. (Tr. 30.)  Before proceeding to step four, the ALJ determined that Evans had the residual functional capacity ("RFC") to perform light work. (Tr. 30.)

Based on this RFC, the ALJ concluded at step four that Evans could not perform any of his past relevant work and that he had no transferable skills. (Tr. 30.)  The ALJ proceeded to step five where he determined that, considering Evans's age, education, and experience, Evans could perform "the full range of light work." (Tr. 30.)  Therefore, Evans's claim for DIB was denied. (Tr. 30.)

## III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).  The ALJ's decision must be sustained if it is supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Id.*  Under this standard, the Court reviews the entire administrative record, but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its

11

judgment for the Commissioner's. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

Generally, a remand for further proceedings by the Commissioner is the appropriate remedy when an ALJ's decision is not supported by substantial evidence. *Rohan v. Barnhart*, 306 F. Supp. 2d 756, 770 (N.D. Ill. 2004). An award of benefits, such as Evans seeks here, is "essentially a factual finding best left for the [Commissioner] to address in the first instance, *unless* the record can yield but one supportable conclusion." *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993) (emphasis added); *see also Briscoe v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005) ("It remains true that an award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability."); *Rohan*, 306 F. Supp. 2d at 770.

## IV.  APPLICABLE LAW

To be considered disabled under the Act, a claimant must establish that he is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). The impairment must be severe, causing the claimant to be unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 405.1505-1511.

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)

12

whether the claimant is incapable of performing work in the national economy.[6] 20 C.F.R. § 404.1520; *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant on every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## V. ANALYSIS

In its motion to remand, the Commissioner acknowledges that a remand for further proceedings in this case is appropriate so that the ALJ may properly consider the medical source opinions and Evans's credibility, specifically determine Evans's literacy and his residual functional capacity, and obtain evidence from a vocational expert and a medal expert.  Evans, however, contends that any remand should direct the payment of DIB as of Evans's fiftieth birthday and should mandate the administration of a psychological evaluation that includes standardized literacy and intelligence testing.  Evans's contentions will each be discussed in turn, though neither is ultimately successful.

### 1. A Remand for the Payment of DIB as of Evans's Fiftieth Birthday Is Not Appropriate on this Record

Evans first asserts that six physicians of record restricted him to sedentary work and thus a remand for the payment of DIB as of January 24, 2005, Evans's fiftieth birthday, is warranted. He correctly explains that a claimant who is fifty years old, who has a limited education, and

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC, that is, what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

13

who is limited to unskilled sedentary work is deemed "disabled" under the grids. 20 C.F.R. § 404, Subpt. P, App. 2, Rule 201.09.

To set the stage, although an ALJ may ultimately decide to adopt the opinions expressed in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. § 404.1527(e); SSR 96-5p. The RFC assessment "is based upon consideration of *all* relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p (emphasis added); *see* 20 C.F.R. § 404.1545. Thus, a medical source opinion concerning a claimant's work ability is *not* determinative of the RFC assigned by the ALJ. *See* SSR 96-5p ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment.") (emphasis added).

Here, the treating physicians who expressly assigned Evans sedentary work restrictions did so within the first year after Evans's August 2001 injury. Specifically, Evans's sedentary work restrictions were assigned by Dr. Trumble in September 2001, by Dr. Lazoff in December 2001, and by Dr. Shugart in February 2002. Though Dr. Trumble's and Dr. Lazoff's restrictions appeared more temporary in nature, Dr. Shugart assigned "a permanent sedentary restriction." (Tr. 176.)

Likewise, in March 2002, Dr. Fife, the reviewing state agency physician, agreed with the opinions of Evans's treating physicians, and her opinion was affirmed by a second state agency

14

physician in November 2002.  Dr. Warrener, Evans's general practitioner, never actually articulated precise exertional work restrictions; rather, in February 2003 he checked the "total disability" box on a form and opined: "I don't believe [Evans] will ever be able to return to his former work.  He will always be severely limited in lifting, bending, etc." (Tr. 316.)

Dr. Hartman, however, did not render an opinion regarding Evans's work limitations.  In fact, Dr Hartman's examination in 2004 suggests that perhaps Evans's physical status may have improved somewhat over time.  To explain, though Evans still complained to Dr. Hartman of consistent pain between a "five" and a "ten," his muscle testing evidenced that he had normal lower extremity strength of "5/5," while his muscle testing in 2001 and 2002 showed diminished lower extremity strength of "3/5." (*Compare* Tr. 207-08, 303-05, *with* Tr. 330-34.)  This premise is seemingly consistent with the following statement made by Dr. Shugart in February 2002 when he assigned Evans a permanent sedentary restriction: "I think with time he will show improvement." (Tr. 176.)

Moreover, in contrast to prior medical source opinions, Dr. Hartman opined that further testing was indicated to determine whether Evans may ultimately be candidate for surgery to remedy some of his symptoms.  Consequently, additional evidence from Dr. Hartman and the expertise of a medical expert is necessary to determine whether Evans's physical status in 2004 conflicts with the earlier physicians' opinions that assigned Evans a sedentary work limitation. *Clifford*, 227 F.3d at 870 (articulating that "an ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record"); *Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir. 1996) (emphasizing that "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings").

15

Furthermore, as the ALJ observed, several physicians and physical therapists of record opined that Evans's symptoms were worse than his objective findings or that he exhibited an exaggerated response to certain tests or activities. (*See* Tr. 148, 206-09; 285, 287, 330-34.)  Such evidence could cause an ALJ to discount the opinions of the physicians who limited Evans to sedentary work. *See Dixon*, 270 F.3d at 1178 ("An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations."); *Smith v. Apfel*, 231 F.3d 433, 441 (7th Cir. 2000) (discounting the restrictions assigned by a physician because they lacked the support of the objective medical evidence).

Thus, in light of Dr. Hartman's 2004 evaluation and suggestions from several medical sources of record that Evans presented symptoms of a severity that were not necessarily supported by their objective findings, sufficient doubt is present to prohibit the outright award of benefits by the Court as of Evans's fiftieth birthday. *See generally Burroughs v. Massanari*, 156 F. Supp. 2d 1350, 1367-68 (N.D. Ga. 2001) (articulating that the court may award DIB if the Commissioner "has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability *without any doubt*") (emphasis added).  Indeed, the appropriate weight to give a physician's opinion and the resolution of any inconsistency between Evans's physical status in 2002 and his physical status in 2004 is more properly determined by the ALJ upon remand. *See Young v. Barnhart*, 362 F.3rd 995, 1001 (7th Cir. 2004) (articulating that it is not this Court's function to "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner").

Therefore, the case will be remanded so that the ALJ may properly consider the medical

16

source opinions of record in accordance with 20 C.F.R. § 404.1527(d) and so that the ALJ may develop the record with respect to the reports from Evans's most recent treating physicians. If necessary, any inconsistency between Evans's physical status in 2004 and his physical status in 2002 must be resolved by the ALJ upon remand.

### 2. A Psychological Examination With Standardized Testing Will Not Be Mandated Upon Remand

Evans next contends that the Court should order the ALJ upon remand to have Evans undergo a consultative psychological examination that includes administration of a "WRAT-III" to test his literacy and a "WAIS-III" to test his intelligence. Evans's request, however, is ultimately unpersuasive.

The applicable regulations provide: "[T]he decision to purchase a consultative examination . . . will be made after we have given full consideration to whether the additional evidence needed (e.g., clinical findings, laboratory tests, diagnosis, and prognosis) is readily available from the records of your medical sources. . . . Before purchasing a consultative examination, we will consider not only existing medical reports, but also the disability interview form containing your allegations as well as other pertinent evidence in your file." 20 C.F.R § 404.1519(a). More succinctly, the Seventh Circuit Court of Appeals has stated that consultative examinations are not required unless they are necessary for the ALJ to make a disability determination. *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991); *see also Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994) (articulating that when the evidence before the ALJ is insufficient to determine whether a claimant is disabled, the ALJ "will either request additional existing records, recontact claimant's treating sources or any other examining sources, or ask the claimant for more information *or to undergo a consultative examination*") (emphasis added).

Here, the Commissioner has requested a remand so that the ALJ may "obtain additional evidence relative to [Evans's] literacy pursuant to 20 C.F.R. § 404.1564 and to make a specific finding as to whether [Evans] is literate . . . ." (Def.'s Mot. to Remand at 2.)  In response, Evans asserts that "the issue of illiteracy and IQ will not be properly developed and resolved unless a psychological evaluation and [the WRAT-III and the WAIS-III] are ordered." (Pl.'s Resp. to Def.'s Mot. for Remand at 4.)

Contrary to Evans's request, the Court will not dictate the specific terms of the "additional evidence" that the Commissioner desires to obtain concerning Evans's literacy, particularly in this circumstance where it is unclear whether the ALJ has given "full consideration" to the evidence of record. *See generally Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("[B]ecause it is always possible to identify one more test or examination an ALJ might have sought, the ALJ's reasoned judgment of how much evidence to gather should generally be respected.").  For example, we do not know whether the ALJ considered Evans's representation on his DIB application that he *could* read and write in English, (*see* Tr. 94), or whether Evans required assistance in completing the DIB application.  Thus, the ALJ may choose to seek additional information from Evans prior to deciding whether a consultative examination to determine Evans's literacy is necessary. *See Luna*, 22 F.3d at 693.

Moreover, Evans's assertion that the Court should order him to undergo the WAIS-III to determine whether he may meet a listed impairment for mild mental retardation is particularly unavailing at this stage of the proceedings.  Evans never asserted that he suffered from mental retardation in his DIB application, nor did he raise this issue at the hearing or in his opening brief. *See generally Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (emphasizing that a

18

claimant has the initial duty to bring forth evidence supporting a finding of disability); *Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (holding that arguments not presented to the court in a response to a summary judgment motion are deemed waived); *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1998) (stating that "an ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made his best case").

Therefore, Evans's request that the Court order the ALJ to obtain a psychological examination that includes the WRAT-III and the WAIS-III will be denied.  However, as requested by the Commissioner, the case will be remanded so that the ALJ may reconsider Evans's literacy in accordance with 20 C.F.R. § 404.1564, obtaining a consultative psychological examination and literacy testing if necessary.

## VI.  CONCLUSION

For the foregoing reasons, the Commissioner's Motion to Remand (Docket # 19) is GRANTED; as the Commissioner requested, the decision of the Commissioner is REVERSED and the case is REMANDED so that the ALJ may properly consider the medical source opinions and Evans's credibility, specifically determine Evans's literacy and residual functional capacity, and obtain evidence from a vocational expert and a medical expert.  The Clerk is directed to enter a judgment in favor of Evans and against the Commissioner.  SO ORDERED.

Enter for this 18th day of January, 2007.

                                          S/Roger B. Cosbey
                                          Roger B. Cosbey,
                                          United States Magistrate Judge